FILED
2021 Apr-01  PM 04:57
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

BWW, Inc., dba SERVPRO of Birmingham

     Plaintiff/Petitioner

     VERSUS

James Brigham, Senior Vice President for Finance and Administration and Chief Financial Officer of Jacksonville State University in his official and individual capacities; David Thompson, Director, Capital Planning and Facilities of Jacksonville State University in his official and individual capacities; Don C. Killingsworth in his official capacity as President of Jacksonville State University; A-K: those officers, employees or agents of Jacksonville State University or of those agencies, departments or offices having or asserting authority over the review, approval, submission for payment and payment of Plaintiff/Petitioner invoices for work performed in the disaster recovery and restoration of facilities at Jacksonville State University in their official capacities;

     and

L-R in his/her/their individual capacities who acting under color of state law wrongfully diverted, converted to other purposes, withheld or otherwise impeded the tender of funds intended, designated and/or approved for payment of Plaintiff/Petitioner for work performed in the disaster recovery and restoration of facilities at Jacksonville State University; wrongfully intercepted, retained and/or refused to relinquish dominion over funds to which the Plaintiff/Petitioner was entitled under laws of the United States and the State of Alabama; fraudulently induced Plaintiff/Petitioner to continue performance of its work on behalf of Jacksonville State University and thereby expend funds and resources and incur significant financial costs and obligations by falsely promising to pay therefore; misrepresented that the Plaintiff/Petitioner would receive those funds intended for the payment of Plaintiff/Petitioner thereby fraudulently inducing Plaintiff to expend funds and resources, and incur significant financial costs; and who, contrary to the Constitutions and laws of the United States and the State of Alabama deprived Plaintiff/Petitioner of the property interest vested in it for payment under the terms of its Disaster Recovery Authorization and Service Contract with Jacksonville State

University;  who in violation of the clearly established laws of the United States, contrary to the constitutions, laws, rules or regulations of the United States, and/or State of Alabama, or who acted willfully, maliciously, fraudulently, in bad faith, beyond their authority, or under a mistaken interpretation of the law, acted to deprive Plaintiff/Petitioner of its rights to  compensation and recompense for its work on the disaster recovery and restoration of the facilities of Jacksonville State University under the Disaster Recovery Authorization and Service Contract, and otherwise deprived Plaintiff/Petitioner of its property rights without due process of law:

> And

S-Z, individuals, Contractors or entities while acting as, as agents of, or in concert with JSU or other agency, department or officer of the State of Alabama, or insurers or re-insurers or with authority for or over the payments due to SERVPRO for performance of its obligations under the Disaster Recovery Authorization and Service Contract described herein, that wrongfully intercepted, retained and/or refused to relinquish dominion or otherwise participated in that wrongful conduct, over funds to which the Plaintiff/Petitioner was entitled under laws of the United States and the State of Alabama, :

> Defendants/Respondents

## COMPLAINT

## JURISDICTION and VENUE

1.     This Court has original jurisdiction under 28 USC §1331 for those claims based on the Constitution and laws of the United States, and supplemental jurisdiction under 28 USC §1367(a) of those claims arising under the Constitution and laws of the State of Alabama.  The amount in controversy exceeds $11,000,000.

2.     Venue is appropriate under 28 USC §1391(b)(1)(2).  The Defendants or at least one of them resides in the Northern District of Alabama and a substantial part of the events and omissions giving rise to these claims occurred within it.

3.     Because a substantial part of the events and omissions at issue occurred in Calhoun County Alabama, assignment to the Eastern Division of this Court is appropriate.

**PARTIES**

**Plaintiff/Petitioner**

4.     BWW, Inc., dba SERVPRO of Birmingham, is an Alabama corporation with its principal place of business located in Shelby County, Alabama.

**Defendants/Respondents**

5.     James Brigham is a resident of Calhoun County Alabama, serves now and served at all times in the past relevant to this action, as Senior Vice President for Finance and Administration and Chief Financial Officer of Jacksonville State University (JSU).  He is sued in his official capacity for prospective injunctive relief under federal law and for mandamus relief under Alabama law.  He is sued in his individual capacity for damages and other legal relief under laws of the United States and the State of Alabama.

6.     David Thompson is a resident of Calhoun County Alabama.  He serves now and served at all times relevant to this action as Director of Capital Planning and Facilities of JSU.  He is sued in his official capacity for prospective injunctive relief under federal law and mandamus relief under Alabama law. He is sued in his

individual capacity for damages and other legal relief under laws of the United States and the State of Alabama.

7.     Don C. Killingsworth is a resident of Calhoun County Alabama and serves now as President of JSU.  He is sued only in his official capacity and only prospective injunctive and mandamus relief are sought against him.

8.     Defendants A-K are those officers, employees or agents of JSU with responsibility and authority for review, approval, submission for payment and/or payment of Plaintiff/Petitioner's invoices for work performed in the disaster recovery and restoration of facilities at JSU.  Their names and positions although presently unknown to Plaintiff/Petitioner will be the subject of initial discovery and will be substituted herein as soon as ascertained.  They are sued only in their official capacities for prospective injunctive relief under federal law and mandamus relief under Alabama law.

9.     Defendants L-R are those present or former officers, employees, or agents of JSU or individuals or entities otherwise having authority and responsibility for JSU's performance of its obligations under the Disaster Recovery Authorization and Service Contract including: those with the responsibility for the negotiation, administration, management and or performance of the Disaster Recovery Authorization and Service Contract between JSU and SERVPRO, and for the review, approval, submission for payment and/or payment, receipt, accounting of

invoices and/or custody of funds due to SERVPRO for work and services performed under its Disaster Recovery Authorization and Service Contract with JSU, and who engaged in the wrongful conduct described *infra*. They are sued in their individual capacities for legal damages and other appropriate relief and to the extent they continue to serve in a relevant position at JSU or otherwise have authority and responsibility for JSU's performance of its obligations under the Disaster Recovery Authorization and Service Contract, in their official capacities for prospective injunctive and mandamus relief. Their names and positions although presently unknown to Plaintiff/Petitioner will be the subject of initial discovery and will be substituted herein as soon as ascertained.

10.    Defendants S-Z are those individuals, contractors or entities while acting as, as agents of, or in concert with JSU or other agency, department or officer of the State of Alabama, or insurers or re-insurers thereof with authority for the review, adjustment, auditing, or power of determination over the payments due to SERVPRO for performance of its obligations on behalf of JSU's recovery, that wrongfully intercepted, retained and/or refused to relinquish dominion or otherwise participated in that wrongful conduct, over funds to which the Plaintiff/Petitioner was entitled under laws of the United States and the State of Alabama, Their names and positions although presently unknown to Plaintiff/Petitioner will be the subject of initial discovery and will be substituted herein as soon as ascertained.

## STATEMENT OF FACTS

### The Tornado, the Damage and the
### "Disaster Recovery Authorization and Service Contract"

11.     March 19, 2018 a highly destructive F3 tornado struck the main campus of JSU in Calhoun County, Alabama damaging fifty-two of its approximately sixty buildings. The University was devastated and many facilities including classrooms, offices, student residences, libraries and athletic facilities were severely damaged. Many were rendered unusable, and all required extensive restoration and repair to be returned to service.

12.     The devastating damage to the campus precluded JSU from continuing its educational mission. Immediate and comprehensive disaster recovery and restoration were necessary for JSU to resume educating its current student body and recruiting prospective students.

13.     The scope of destruction was recognized by authorities of the State of Alabama and the United States who issued the necessary disaster declarations to secure the necessary resources, to authorize the execution of necessary authorizations, agreements, work orders and contracts and fund expenditures for the immediate work toward the restoration of its campus so that JSU could return to its educational mission.

14.     On March 20, 2018, the day after the JSU campus was devastated, its facilities incapacitated by the violence of the tornado, and its educational mission

imperiled, the Defendants selected SERVPRO to rapidly execute a significant portion of the disaster recovery and restoration; SERVPRO's speedy work was paramount to JSU's reopening.

15.     David Thompson, Director of Capital Planning and Facilities, duly authorized by and acting on behalf of JSU, negotiated and agreed to the terms of the Disaster Recovery Authorization and Service Contract between JSU and SERVPRO describing and confirming the terms and conditions governing the obligations of both parties.

[The entire Disaster Recovery Authorization and Service Contract and the executed rate sheet confirming details concerning performance and compensation rates are attached as Exhibit A.]

16.     Under the Disaster Recovery Authorization and Service Contract SERVPRO's work was to be compensated at agreed upon rates representing different trades and skill-levels.  By subsequent amendment, at the directive of JSU, all work under the Disaster Recovery Authorization and Service Contract was performed by skilled labor at the appropriate rate.

17.     In the Disaster Recovery Authorization and Service Contract, JSU and SERVPRO agreed that:

> 1.     Invoicing and Payment: Service Provider [SERVPRO] shall submit to Customer [Jacksonville State University] itemized invoice(s) setting forth the total Charges due. Customer agrees to pay such fees and

charges for the Scope of Work in accordance with the following schedule: **Bill monthly for prior month.** [Emphasis added]

Initial draw based upon initial (sp) assessment,

a.      $_____ on or before _____.
b.      $_____ on or before _____.
c.      The balance of fees and charges for the Scope of Work and change orders shall be paid within thirty

(30) days from the Customer's receipt of the final invoice.

If payments are not received within thirty (30) days, Customer agrees to pay all costs of collections up to and including court costs, reasonable attorney's fees and interest charges at the lesser of 1) 1.5% per month; or 2) the maximum lawful interest rate permitted by applicable law. In the event Customer shall fail to pay any periodic installment payment, such failure shall constitute a breach authorizing Service Provider to cease work without breach pending payment or resolution of any dispute. [Attachment A p. 1]

18.    Consistent with the industry practice of "holdbacks", and with the agreement between JSU and SERVPRO, SERVPRO reduced each invoice submitted between March 18, 2018 and May 14, 2018 by a factor of 25%, and then after May 20, 2018 by a factor of 10%.

19.    Under this holdback practice, SERVPRO reduced each of its periodic invoices by the holdback amount (25% initially and then 10%) to be retained by JSU until completion, review, and final acceptance of SERVPRO's work under the Disaster Recovery Authorization and Service Contract.

20.    The purpose of such holdbacks is to accommodate allowances for inevitable subsequent adjustments and recalculations of invoice components, including hours of work submitted, rates of compensation, costs of equipment and related charges.

21.    Upon completion and acceptance of SERVPRO's work under the Disaster Recovery Authorization and Service Contract, the amount deducted (or "held back") from the periodic invoices, less any subsequent adjustments, was due to be tendered to SERVPRO by JSU.

22.    Without explanation, justification, or notice JSU, through the action or inaction of the Defendants payments ceased as of April 29, 2019.  Subsequently the defendants have refused to tender any of the funds due as invoiced, received by JSU in response to SERVPRO invoices, retained under the holdback practice, or accrued as overdue payments, to provide any explanation for the refusal, or until the repudiation of December 3, 2020, even acknowledge that payments were stopped.

23.    Funds designated to be used by JSU as payments to SERVPRO were derived from a variety of sources including JSU's institutional funds, insurance coverage maintained by JSU, insurance coverage maintained by other departments and entities of the State of Alabama, excess and/or re-insurance coverage maintained by JSU and/or other departments and entities of the State of Alabama, self-insurance funds maintained by JSU and/or other departments and entities of the State of

9

Alabama, and the Government of the United States through appropriations to its departments and agencies including the Department of Homeland Security and the Federal Emergency Management Agency (FEMA).

24.     Under the Disaster Recovery Authorization and Service Contract JSU agreed to tender and assign to SERVPRO any and all payments and rights to such payments made from these or any other sources of funds made or available to it for satisfaction of its obligations to SERVPRO.  The Disaster Recovery Authorization and Service Contract provides:

> **Responsibility for Payment**: By signing below, Customer hereby instructs Customer's insurance carrier to pay Service Provider directly for Services, emergency or otherwise, less any deductible actually paid by Customer. Customer shall remain primarily liable and fully responsible for payment and agrees to make such payment in a timely manner in accordance with the terms of this Disaster Recovery Authorization and Service Contract. **If for any reason Customer receives a check or draft from insurance company made payable to Customer, Customer agrees to remit payment immediately to Service Provider and hereby assigns to Service Provider the right to any such payment.** Customer agrees to make payment for Charges, regardless of whether Customer or another person or entity is legally responsible for payment or whether Customer is entitled to reimbursement for such costs from some other person or entity or insurance carrier(s).  (emphasis in original) Attachment A, p. 1-2.

## SERVPRO's Performance

25.     SERVPRO immediately assembled the personnel, resources and expertise necessary to fulfill its obligations under the Disaster Recovery Authorization and Service Contract.

26.     Using its own staff, association of additional staff, and retention of subcontractors, SERVPRO immediately began work on the campus.

27.     All of SERVPRO's work was fully coordinated with JSU personnel on a daily basis (often many times a day) and with all appropriate authorities of the State of Alabama and the United States who had any responsibility under or role in the JSU Disaster Recovery Authorization and Service Contract, the procurement, expenditure or accounting for funds authorized for its work.

28.     All of SERVPRO's work was fully coordinated with other inspectors, building consultants, adjustors, architects, subcontractors, and others retained by JSU personnel or other authorities of the State of Alabama and the United States or their insurers, re-insurers, excess-insurers, or other sources of financial resources responsible for payment for campus restoration.

29.     SERVPRO met, conferred, and coordinated with these officials and/or their representatives every day and often multiple times a day as it worked to perform its obligations under the Disaster Recovery Authorization and Service Contract.

30.    SERVPRO's work schedules, priority of specific tasks, order of facility restoration, and all other aspects of its work for JSU was subject to continuous revision according to competing and changing institutional needs, weather conditions, job performance by other contractors and similar factors.

31.    At all times SERVPRO's performance of its Disaster Recovery Authorization and Service Contractual obligations was reviewed, inspected and approved for payment by JSU officials, individuals upon whom JSU relied to conduct such invoice reviews and approvals, and representatives of all other involved agencies of the State of Alabama, the United States, and an array of consultants and advisors retained by them.

32.    SERVPRO devoted itself, its own personnel and the subcontractors which it secured and coordinated, to rebuild and restore JSU so that it could resume its educational mission and so its students, faculty, and staff could return to their normal daily lives, studies and work.

33.    Under the Disaster Recovery Authorization and Service Contract SERVPRO conducted or participated substantially in the repair and restoration of 52 JSU facilities.

34.    Because of SERVPRO'S expeditious fulfillment of its obligations under the terms of the Disaster Recovery Authorization and Service Contract, JSU returned its facilities to full use in time for the 2018 Fall semester.

35.   JSU officials repeatedly expressed their gratitude to SERVPRO, praised it to others and even solicited SERVPRO for future work on the campus

36.   As required by the Disaster Recovery Authorization and Service Contract, SERVPRO submitted periodic invoices along with supporting documentation to JSU officials and/or their designees for review and acceptance.

37.   Those invoices or some of them, along with documentation of their receipt, review and acceptance by JSU were then shared with and/or forwarded by JSU to a variety of sources responsible for payment. These included JSU internal funds, private insurance carriers, excess and/or re-insurance carriers, funds maintained by the State of Alabama and those with responsibility for receipt, custody and expenditure of federal disaster-recovery funds.

38.   SERVPRO's initial invoices for work on JSU's campus, totaling over 50 million dollars were submitted to JSU, where the invoices were reviewed, approved, and paid in a timely fashion.

39.   Without explanation, subsequent payments were delayed or partially paid, even though SERVPRO's satisfactory work continued.

40.   After April 29, 2019, and at approximately the same time that a consortium of excess and re-insurers carriers were called upon to honor their indemnity obligations, payment of SERVPRO's invoices stopped altogether.

41.     Despite the Defendants' repeated assurances and representations that payment was in process and would be forthcoming, SERVPRO has not been paid for a substantial portion of work completed under the Disaster Recovery Authorization and Service Contract, accepted by JSU and over fifty campus facilities returned to service.

42.     SERVPRO fulfilled all obligations under the Disaster Recovery Authorization and Service Contract for JSU repair and restoration; by virtue of acceptance by appropriate JSU officials SERVPRO is entitled to the payment for the remainder of JSU's Disaster Recovery Authorization and Service Contractual obligation for work that has been performed and accepted which allowed the campus and buildings to return to service.

43.     By virtue of the fulfillment of the Disaster Recovery Authorization and Service Contract for JSU repair and restoration and the acceptance of that work by appropriate JSU officials, SERVPRO is entitled to a substantive response to its repeated demands for payment, clarity as to any purported justification for the failure to fulfill JSU's obligations and JSU's intention to pay or not to pay the remaining amount due.

44.     Under Alabama law, SERVPRO is entitled to payment for its performance of the Disaster Recovery Authorization and Service Contract, to ownership and control of all funds in possession of JSU or available to it for the

purpose of fulfilling JSU's duties under the Disaster Recovery Authorization and Service Contract, and to good faith performance by the Defendants of their obligations under the Disaster Recovery Authorization and Service Contract including clarity of any rationale for non-payment or delay of payment for any contested portion, or portions of SERVPRO's work.  In violation of the terms of the Disaster Recovery Authorization and Service Contract, contrary to the governing law, and heedless of the covenant of good faith and fair dealing, SERVPRO was not provided any explanation for the Defendants' failure to provide earned compensation for its performance of the Disaster Recovery Authorization and Service Contract, nor any rationale for the delay in payment until December 3, 2020.

### On December 3, 2020, the Defendants attempted to rewrite and thereby revoked and repudiated their obligations under the Disaster Recovery Authorization and Service Contract.

45.    On December 3, 2020 after repeated delays, reviews, and unfulfilled promises to pay for SERVPRO's services reflected in outstanding invoices, equivocations and misrepresentations as to the status and prospects for its fulfillment of JSU's obligations, the Defendants repudiated the terms of the Disaster Recovery Authorization and Service Contract and notified SERVPRO that they no longer intended to pay SERVPRO as required by the existing agreement, and made any future payments subject to new conditions, extraneous to the terms of the agreement and beyond the control of either SERVPRO or these Defendants to meet.

46.    In a letter to SERVPRO counsel of December 3, 2020, JSU Counsel gave the first notice to SERVPRO that JSU, through the actions of these Defendants, no longer intended to fulfill its obligations under the Disaster Recovery Authorization and Service Contract unless and until, "…the FBI investigation is concluded and JSU is assured by the State of Alabama that any further payments to ServPro will be reimbursed." [12/3/2020 Letter: Harley to Hair.  Attached as Exhibit B]

47.    The attempt retrospectively to rewrite the Disaster Recovery Authorization and Service Contract and impose additional conditions on the Defendants' obligations under it for which SERVPRO has neither responsibility nor control is a repudiation and an express renunciation of the Disaster Recovery Authorization and Service Contract and notice that the Defendants have neither the intention nor ability to comply with its terms.

48.    Because accountability for the expenditure of significant federal funds, such as those provided to aid in the restoration of JSU, is always subject to review and potential recoupment actions by responsible federal agencies, JSU's "concluded" investigation condition is a renunciation of its obligations to SERVPRO and potentially other unpaid contractors.  JSU and other involved state agencies and officials, all the Defendants and others involved are responsible for cooperating with such reviews.   SERVPRO has and continues to fully cooperate with any

16

investigation by the federal government.  Federal agents have specifically indicated that SERVPRO is not the target of any criminal investigation.

49.    The second new condition imposed by JSU in the December 3, 2020 letter, that SERVPRO would not be paid until some other agency promised to "reimburse" JSU, defies all principles of contract law that do not permit evasion of just obligations because a third party does not agree to help out.

50.    The December 3, 2020 letter is the first time that the Defendants, in direct contradiction to prior and repeated representations have renounced [to SERVPRO] their obligation under or intent to comply with the terms of the Disaster Recovery Authorization and Service Contract.

51.    JSU's Dec. 3, 2020 letter is also the first time the Defendants expressed or implied that the quality of SERVPRO's work or the adequacy of the performance of SERVPRO's obligations under the Disaster Recovery Authorization and Service Contract did not meet expectations.

52.    The assertions of JSU's counsel in the December 3, 2020 letter directly contradict the consistent assurances by all employees, representatives and agents of JSU, including Senior Vice President James Brigham, that SERVPRO's work was excellent, that all invoices have been reviewed and approved and that JSU had requested that all SERVPRO invoices be paid.

53.     The assertions of JSU's counsel in the December 3, 2020 letter are in irreconcilable conflict with the categorically contrary statements by his predecessor counsel for JSU in correspondence on behalf of JSU with the Alabama Risk Manager (one of the principal state officials vested with direct and sometimes conflicting authority by Alabama law).

54.     Documents were provided to SERVPRO on February 3, 2021, and in a second production on March 2, 2021 in response to a public record request by SERVPRO counsel to the Alabama Department of Finance.

55.     Among those documents produced was a letter of September 24, 2019 [disclosed by the Department of Finance to SERVPRO counsel on March 2, 2021] from prior JSU counsel to the Alabama Risk Manager. [9/24/2019 Letter: Oscar Price, attorney for JSU to Max Graham, State of Alabama Risk Manager. Attached as Exhibit C]

56.     In it, JSU stated:

a.      The tornado had done "over $100,000,000 in damage" to the campus;

b.      that "JSU was faced with the herculean task of getting the campus in shape to open for the Fall semester";

c.      that "it would have been devastating to JSU and the entire community if JSU could not open for the 2018 Fall semester."

d.      that with full approval of the State Insurance Fund, "JSU hired ServPro who did an excellent job assisting JSU

in getting the campus ready to open."; and "ServPro did an outstanding job getting JSU's campus in a position to open for Fall classes";

e.      and that the entire process was overseen by employees or representatives of the State Insurance Fund: "[A] representative of SIF actively supervised and directed ServPro's work. SIF's representative reviewed and approved all contracts with ServPro. SIF's representative was actively involved in determining each ServPro item of work. SIF's representative reviewed and approved the ServPro invoices and was intimately involved, in a managerial capacity, with all decisions related to ServPro's scope of work and associated costs for every item of loss. At no time did the SIF representative raise any objection to the language of the ServPro contracts, the ServPro rates, or the work being done by ServPro."

57.     JSU also acknowledged the continuing failure to pay SERVPRO fully for its performance under the Disaster Recovery Authorization and Service Contract and its desire to pay SERVPRO as soon as possible, writing that the State Insurance Fund was withholding "approximately $12,000,000 of payments to JSU for ServPro. [Exhibit C]

58.     JSU emphasized in the September 24, 2019 letter that the delays and ultimate refusal of the State Insurance Fund to authorize funds for JSU to make the payments to which SERVPRO was entitled coincided with the first time that excess or re-insurance carriers were called upon to provide payments: "[T]he damage to JSU's campus occurred on March 19, 2018, over a year and a half ago. Although the claims process and the payment of claims initially went very smoothly and claims

and payments were timely and fairly processed, that abruptly changed in January 2019 (this was approximately the time when the total claim reached the level of the reinsurance). Beginning in January 2019, JSU encountered a failure to timely and fairly process and pay claims." and "[I]n January 2019, SIF suddenly had a problem with ServPro's invoices (once again about the time the reinsurers became involved)." [Exhibit C]

59.    JSU reiterated the University's assertions that in spite of repeated requests and inquiries, the State Insurance Fund had never given a sufficient explanation or rationale for its failure to transmit the funds necessary for the university to satisfy its obligation to SERVPRO.

60.    In a discussion between SERVPRO and JSU Senior Vice President James Brigham, on August 5, 2019, Brigham acknowledged that JSU could never have reopened without SERVPRO's efforts, and affirmed JSU's continuing obligation to pay SERVPRO.

61.    In that same discussion, Brigham characterized a response from other State authorities to JSU's request for funds to pay its obligations to SERVPRO as, "…full of bullshit from beginning to end..."

62.     JSU counsel's assertions found in the December 3, 2020 letter are belied also by JSU's continuing requests for SERVPRO's assistance with other subsequent and substantial work on the campus facilities.

**The Irreconcilable Conflicts of Alabama Law Effectively Deny
SERVPRO the Protections of the Constitutions and Laws
of the United States and the State of Alabama.**

63.     The Defendants' failures to respond to or comply with their obligations under the Disaster Recovery Authorization and Service Contract in the context of a variety of laws, regulations and policies of the State of Alabama effectively deny SERVPRO's (or any other similarly situated party to a Disaster Recovery Authorization and Service Contract with JSU) enforcement of its Disaster Recovery Authorization and Service Contractual rights as established by Alabama law.

64.     The overlapping and potentially conflicting assignments of authority and responsibility under Alabama law for fulfilling the Disaster Recovery Authorization and Service Contractual obligations and financial management relevant to this matter effectively shield the Defendants' conduct from meaningful review or challenge thus denying SERVPRO the protections of the Constitutions and laws of the United States and the State of Alabama.

**The History, Governance and Corporate Powers of JSU**

65.     In 1967 JSU, previously governed by the State Board of Education, was granted autonomy from that agency and made subject to the control and jurisdiction of its own Board of Trustees:

> **(a)** There is created a Board of Trustees for Jacksonville State University, the state educational institution formerly

known as Jacksonville State College at Jacksonville, Alabama.

**(b)** The board of trustees shall consist of two members from the congressional district in which the institution is located, one from each of the other congressional districts in the state, one at-large member from the state, one at-large member from outside of the state, and the Governor, who shall be ex officio president of the board.

**(c)** The trustees shall be appointed by the Governor, by and with the advice and consent of the Senate and, commencing on May 26, 2015, shall be appointed to hold office for a term of six years and until their successors shall be appointed and qualified. No trustee shall be appointed to serve more than a total of three full terms.

**(d)** No trustee shall receive any pay or emolument other than his or her actual expenses incurred in the discharge of his or her duties as such.

**(e)** A trustee who has attained the age of 75 years during a term of office may continue to serve until the expiration of that term. A trustee who has departed the board and who has attained the age of 70 years or older may be designated by the board as a Trustee Emeritus and may receive such honorary privileges as conferred by the board.

**(f)** No employee of Jacksonville State University shall be eligible to serve on its board of trustees.

Code of Ala. § 16-52-3

66.    The newly created JSU board was vested with the full and exclusive authority necessary to conduct all functions inherent to the management and operation of the institution:

After August 16, 1967, the board of trustees created by this chapter for Jacksonville State University shall have

exclusive jurisdiction, supervision and control of Jacksonville State University; and the State Board of Education is thereafter divested of all jurisdiction, power and authority with regard to the supervision, management and control of such university. In addition to the powers, duties and authority hereinabove vested in the board of trustees, such board shall have and exercise all power, authority and duties heretofore conferred on, vested in or required of the State Board of Education under any laws of this state with regard to the supervision, management and control of such university; and the board of trustees shall carry out all Disaster Recovery Authorization and Service Contractual obligations heretofore incurred by the State Board of Education respecting the operation of the public schools of the city of Jacksonville. On August 16, 1967, the State Board of Education shall transfer to the Board of Trustees of Jacksonville State University all supplies, funds, books, documents, records and other property or effects of such university.

Code of Alabama §16-52-7

67.     Among its powers and responsibilities, the JSU Board was responsible for the appointment of academic and administrative officers necessary to the management of the institution:

The board of trustees has the power to organize the university by appointing a corps of instructors, who shall be styled the faculty of the university, and such other instructors and officers as the interest of the university may require; and to remove any such instructors or other officers and to fix their salaries or compensation and increase or reduce the same at its discretion; to regulate, alter or modify the government of the university, as it may

> deem advisable; to prescribe courses of instruction, rates of tuition and fees; to confer such academic and honorary degrees as are usually conferred by institutions of similar character; and to do whatever else it may deem best for promoting the interest of the university.

Code of Ala. § 16-52-6

68.    These  powers  and  responsibilities  included  those  ownership, transactional and financial functions including acquisition, custody and expenditure of funds necessary for the operation of the University as well as the legal obligations with commensurate "duties, liabilities and responsibilities":

> Such corporation [Jacksonville State University] shall have all the rights, privileges and franchises necessary to the promotion of the end of its creation and shall be charged with all corresponding duties, liabilities and responsibilities. Such corporation may hold and may lease, sell or in any other manner not inconsistent with the object or terms of the grant or grants under which it holds dispose of any property, real or personal, or any estate or interest therein, remaining of any grant by any governmental unit or by any person, or accruing to the corporation from any source, as it may deem best for the purposes of the university.

Code of Ala. § 16-52-2

69.    The Defendants are authorized by the JSU board to exercise their power and discretion in managing the University's daily operations, and as such had both the real and apparent legal authority to attend to the institution's repair, restoration and return to service after the tornado.

70.     Acting under the Board's grant of legislative power these Defendants had the authority to enter into the Disaster Recovery Authorization and Service Contracts, commitments, undertakings and agreements of the type necessary to restore JSU to a functioning status, including those between JSU and SERVPRO at issue in this case.

71.     In their exercise of that authority these Defendants had and have the attendant obligations to adhere to the terms of such Disaster Recovery Authorization and Service Contracts, commitments, undertakings, and agreements.

72.     Notwithstanding these categorical assignments of authority and responsibility to JSU, its Board of Trustees and officials, in its foundational statutes, Alabama law vests similar, overlapping and potentially conflicting authorities over the receipt, custody and expenditure of funds to which SERVPRO was entitled and that the Defendants were obligated to tender to SERVPRO.

73.     These Defendants acting alone and in concert with officials and entities of the State of Alabama, including JSU, the Alabama Department of Finance, its components and divisions including the Division of Risk Management and the State Insurance Fund (SIF), the Alabama Emergency Management Agency and their officials solicited and received funds from a variety of sources including those appropriated by Congress and designated for use by the Department of Homeland Security, its component, the Federal Emergency Management Agency (FEMA),

other federal agencies, insurance or indemnity funds maintained by the State of Alabama and overseen by the State Insurance Fund (SIF), private insurance and reinsurance entities, and the like.

74.    These Defendants acting alone and in concert with officials and entities of the State of Alabama, including JSU, the Alabama Department of Finance, its components and divisions including the Division of Risk Management, the Alabama Emergency Management Agency and the State Insurance Fund (SIF) and their officials solicited and received funds from a variety of other sources including funds and agencies of the State of Alabama, indemnity obligations of private insurance corporations or entities intended for the payment of expenses related to tornado damage recovery, facility restoration and repair from all insured sources of damage, and other sources.

75.    These funds or portions of them were solicited and received by and/or transferred to some or all of the Alabama agencies listed above specifically as payment to SERVPRO for the performance of its obligations under the Disaster Recovery Authorization and Service Contract as reflected in SERVPRO invoices.

76.    These funds included payments for specific and identifiable services provided by SERVPRO in satisfaction of its obligations under the Disaster Recovery Authorization and Service Contract, accepted by the Defendants, returned to service at JSU and reflected in invoices submitted by SERVPRO to JSU.

77.    These funds included those designated by appropriations of the United States Congress for use in disaster recovery efforts and distributed to the Defendants for satisfaction of JSU's payment obligations to SERVPRO under the Disaster Recovery Authorization and Service Contract.

78.    These funds also included payments made to the Defendants from private insurance and reinsurance carriers, designated state insurance funds, and a variety of other sources.

79.    These funds intended for payment of JSU's Disaster Recovery Authorization and Service Contract obligation to SERVPRO, or a portion of them were transferred by the departments, agencies or divisions listed above, to the custody and control of JSU and these Defendants.

80.    A portion of those funds transferred to the custody and control of JSU and these Defendants and due to be paid to SERVPRO under the terms of the Disaster Recovery Authorization and Service Contract were either retained by JSU and these Defendants or diverted to the benefit of other JSU creditors or otherwise wrongfully withheld from SERVPRO.

**Conflicting Assignments of Authority and Responsibility Under Alabama Law**

81.    Separate and apart from JSU's autonomous statutory authorities and responsibilities, Alabama law vests potentially conflicting authority in a variety of other state agencies and officials.

82.    These separately designated and conflicting responsibilities and authorities for the collection, custody and distribution of such funds is described and provided under grants of authority by Alabama statutes, including, *inter alia* Code of Ala. § 41-4-3-306.

83.    The Department of Finance and its Director have direct or indirect authority over several other state agencies and officers involved in the relevant processes:

§ 41-4-3. Duties.
It shall be the duty of the Department of Finance:
**(1)** To manage, supervise and control all matters pertaining to the fiscal affairs and fiscal procedure of the state, except such as may, by the constitution or statute, be specifically required to be performed by the Auditor, the Treasurer or the Department of Revenue, and to keep all records, accounts and data relating thereto.
**(2)** To manage and supervise all state real property wherever located through a centralized organization within the department.
**(3)** To manage, supervise and control the insurance of all state property, wherever located.
**(4)** To operate, manage and administer the State Insurance Fund.
**(5)** To make the annual financial report of the state, as soon as possible after the close of each fiscal year, in accordance with approved public accounting practice, and in such form and such detail as may be necessary to present an accurate description of the financial condition of the state during the preceding fiscal year. The reports of the Auditor and the Treasurer shall be bound with, and printed as a part of, such report.
**(6)** To conduct such studies, to secure such information and data, to make such reports and to furnish such

information as may be required by the Governor or the Legislature.

Code of Ala. § 41-4-3

84.    Within and subject to the control of the Department of Finance, the

Division of Risk Management's authority and responsibility is also defined by

Alabama statute:

§ 41-4-301. Functions, powers and duties.

The function, powers and duties of the division of risk management shall be as follows:

**(1)** To carry out the provisions of Section 41-15-1 et seq., relating to the state insurance fund and Section 36-1-6.1 relating to the State Liability Insurance Fund;
**(2)** To assist and advise the Finance Director on insurance and bonding matters;
**(3)** To provide information and recommendations to the Legislature when requested;
**(4)** To provide programs and/or guidelines leading to premium and financial risk reductions, to include collection and investment of premiums, rate making, and claims administration; and
**(5)** To make, with the approval of the Finance Director, rules and regulations necessary to implement the provisions of this article.

Code of Ala. § 41-4-301

41-4-302. Authority as to insurance programs not specifically enumerated.

**(a)** The Division of Risk Management shall have the authority to institute, manage, and administer programs of insurance, not specifically enumerated herein and which do not conflict with existing laws, upon a determination

> by the Director of Finance and the Governor that such
> insurance program or programs serve the best interests of
> the state.

Code of Ala. § 41-4-302

85.     The State Insurance Fund as an entity defined by Alabama statute and

also under the jurisdiction of the Director of Finance, has concurrent and potentially

conflicting responsibilities for the administration of funds relevant to the action:

> There shall be a fund, to be known as the State Insurance
> Fund, carried by the State Treasurer for the purpose of
> insuring direct physical loss on buildings and contents for
> the perils as may be determined by the Finance Director in
> which title in whole or in part is vested in the State of
> Alabama or any of its agencies or institutions or in which
> funds provided by the state have been used for the
> purchase of the land, construction of the building,
> purchase or maintenance of any equipment, machinery,
> furniture, fixtures or supplies in such buildings and public
> school buildings together with the contents of all such
> buildings; provided, that this section shall neither repeal
> nor in any manner affect the provisions of any local act of
> the Legislature or any general act of local application
> authorizing city or county boards of education or district
> boards of education of independent school districts to
> insure school buildings and property either in the State
> Insurance Fund or in an insurance company, whichever in
> the opinion of such board provides the best coverage for
> such school buildings and property.

Code of Ala. § 41-15-1

86.     The Alabama Emergency Management Agency, also a creature of

Alabama statute, was vested with overlapping and potentially conflicting authority

for the administration of certain funds intended for the restoration and recovery of JSU to which SERVPRO was entitled.  See, Code of Ala. §31-9-2, *et seq.*

87.    These legislative grants of conflicting authorities to distinct agencies and departments of the State of Alabama, and the administrative regulations and policy directives applied in this matter have their own internal limitations and inconsistencies, including the exemption from application for certain Universities:

> § 41-4-303. Exceptions to provisions.
>
> The provisions of this article shall not apply to: Universities and colleges; the state docks; or county and city boards of education, except as is already required by Section 41-15-1 et seq., relating to the State Insurance Fund. Provided however that universities and colleges may elect to participate in, and be covered by, such risk management program. A university or college may elect to participate in and be covered by such program by giving notice thereof to the division of risk management not less than six months prior to the beginning of the fiscal year in which such university or college desires to begin participation in and coverage by such program. Any university or college which elects to be covered by such risk management program may terminate such participation and coverage by giving notice thereof to the division of risk management not less than six months prior to the beginning of the fiscal year such university or college desires to terminate such participation and coverage.

Code of Ala. § 41-4-303

88.    The Code of Alabama also prohibits the comingling of funds by state programs and agencies that have elected to self-insure some or all of their assets:

§ 41-4-304. Commingling of funds.

There shall be no commingling of funds between various self-insured programs.

Code of Ala. § 41-4-304

89.    The Code of Alabama also expressly prohibits departure from the specific requirements and protocols attendant upon the receipt and expenditure of federal funds:

Nothing in this chapter shall be deemed to authorize or require the allotment, handling or expenditure of any moneys received as grants from the federal Department of Health, Education and Welfare or any other agency of the federal government, or the use or disposition of any properties purchased therewith, in a manner contrary to any condition or limitation attached to any such grant.

Code of Ala. § 41-4-9

90.    The conflicting statutory assignments of responsibility and authority for the management of JSU's fiscal affairs, among JSU, the Alabama Department of Finance, the Division of Risk Management, the State Insurance Fund, the Alabama Emergency Management Agency and the regulations and policy directives under which they operate, effectively impairs SERVPRO's rights under the Disaster Recovery Authorization and Service Contract.

91.    The combined effect of the Alabama statutory grants of authority to JSU and its officials, and to the State Department of Finance, the Division of Risk Management, the State Insurance Fund, and the Alabama Emergency Management

Agency effectively abrogates SERVPRO's rights to enforce the Disaster Recovery Authorization and Service Contract and shields the Defendants' conduct beyond ordinary review.

## JSU as a Party to the Disaster Recovery Authorization and Service Contract has Legal Recourse from which SERVPRO is Excluded by Alabama Law.

92.    Unlike SERVPRO, JSU is entitled by Alabama law to secure compliance through binding arbitration to resolve disputed claims with other agencies of the State of Alabama to tender funds intended for the benefit of JSU and its creditors in satisfaction of its Disaster Recovery Authorization and Service Contractual obligations.

93.    Alabama law provides for binding arbitration between JSU and the Department of Finance (and its constituent elements) for the resolution of such claims:

> In the event a disagreement arises between the Department of Finance and any person or persons in charge of any insured property as to its replacement cost or actual cash value or the amount payable under the claim for loss or the proper premium rate or rates, the matter in disagreement shall be determined by a third person to be agreed upon by the Director of Finance on the one hand and the person or persons disagreeing with him on the other. In case of inability to agree on such third person, the Governor shall appoint a third person to determine the question, and his decision thereon shall be binding on all parties concerned.

Code of Ala. § 41-15-8

33

94.     JSU has demanded enforcement of its rights under Code of Ala. § 41-15-8, has participated in an arbitration of its rights to the transfer of funds from those controlled by the Department of Finance, and either has received or expects to receive, funds originally intended for payment of its Disaster Recovery Authorization and Service Contract obligations to SERVPRO, yet has wrongfully continued to refuse to tender those funds to SERVPRO.

95.     Because Servpro did not have the statutory authority to engage in arbitration directly with the Department of Finance and JSU recognized the obligation to pay SERVPRO, JSU's counsel proposed a "pass through agreement" whereby JSU would "pass through" its claims against the Department of Finance in an arbitration proceeding with JSU's assistance in said proceeding.  JSU's counsel drafted several versions of the arbitration agreement for SERVPRO's consideration and input which was given.  When counsel for SERVPRO inquired about the execution of the finalized agreement, SERVPRO was finally informed on May 6, 2020, that "JSU does not want to sign the agreement at this time.  Our concern is the appearance of JSU siding with Servpro versus trying to remain objective".

96.     JSU, through the action or inaction of these Defendants has failed to tender any funds received or acknowledge an obligation to tender any such funds received through the arbitration process provided by Code of Ala. § 41-15-8.

97.   Alternatively, JSU, through the action or inaction of these Defendants has failed to utilize its powers granted under Code of Ala. § 41-15-8 to secure funds to which SERVPRO is entitled under the Disaster Recovery Authorization and Service Contract.

98.   SERVPRO, as party to a Disaster Recovery Authorization and Service Contract with JSU, is excluded from the right to participate in arbitration or other legally binding mechanisms for disputes between and among the various responsible state funds and agencies concerning the management and distribution of funds, including those received by JSU or other state agencies or departments for payment of SERVPRO's invoices for its performance of the Disaster Recovery Authorization and Service Contract.

99.   Separately, and in combination, Alabama statutes governing the receipt, management and distribution of funds intended and designated for the purpose of fulfilling JSU's Disaster Recovery Authorization and Service Contract obligations to SERVPRO operate to abrogate and impair the ability of SERVPRO to enforce its Disaster Recovery Authorization and Service Contract rights to payment for services performed and accepted by JSU.

100.   Alabama statutes, including those cited *infra*, purporting to govern the receipt, management and distribution of funds designated and intended for the payment of disaster recovery expenses such as those at issue in this case, create a

shell-game of incomprehensibly overlapping and often conflicting authorities and responsibilities for securing, administering, and appropriately distributing disaster recovery funds such as those at issue in this case.

101.   As a result of these other Alabama statutes and their application, JSU's ability to comply with the terms of its Disaster Recovery Authorization and Service Contract with SERVPRO and hence SERVPRO's ability to enforce and receive the benefit of its Disaster Recovery Authorization and Service Contract with JSU is impaired.

102.   The combined effect of the application of these Alabama statutes, including the administrative, regulatory and policy determinations authorized thereby renders unenforceable JSU's responsibility for complying with the terms of its Disaster Recovery Authorization and Service Contract with SERVPRO.

## CAUSES OF ACTION

### 42 USC §1983 for Violation of The Constitution and Laws of the United States while Acting Under Color of Alabama Law

103.   The Defendants at all times relevant to the conduct and matters described in this Complaint are or were acting as employees, officers, agents or designees of JSU, an agency of the State of Alabama and/or of a public or private agency or entity vested with the authority to act on behalf of JSU or to take action affecting JSU's ability or responsibility for complying with its Disaster Recovery

Authorization and Service Contract obligations and were thus acting under color of State law as defined by 42 USC §1983.

104.   By their actions the Defendants deprived SERVPRO of its interests to compensation and recompense to which it was entitled for the performance of its obligations under the Disaster Recovery Authorization and Service Contract.

105.   By their actions the Defendants denied SERVPRO's rights as established by the laws of the State of Alabama to secure fulfillment of JSU's obligations under the Disaster Recovery Authorization and Service Contract.

106.   Under Alabama law the contractual right to payment for work performed and service provided is an enforceable property right and the Defendants' actions were and are an impermissible taking of SERVPRO's property interests, in violation of the Fifth and Fourteenth Amendments to the Constitution of the United States, also thereby effectuating an inverse condemnation without legal remedy.

107.   Their actions were made or purported to be made under the inherently contradictory and internally conflicting authorities of the statutes, administrative codes and operational practices and policies of the State of Alabama; the Defendants thus impaired SERVPRO's rights to secure performance of the Disaster Recovery Authorization and Service Contract in violation of Article One Section 10 of the Constitution of the United States.

108.   The laws of the State of Alabama: including the inherently contradictory and internally conflicting authorities of the statutes, administrative codes, practices, and policies as modified and promulgated by officials of the State of Alabama render SERVPRO and others similarly situated to whom a state agency is similarly obligated, without any effective civil remedy.  The Defendants' actions thus constitute a violation of the Fifth and Fourteenth Amendment and Article I §10 of the Constitution of the United States.

109.   To the extent that the Defendants withheld, diverted or otherwise failed to transmit to SERVPRO any funds to which SERVPRO was entitled for performance of its obligations under the Disaster Recovery Authorization and Service Contract that were derived from appropriations of the United States Congress, including funds administered, distributed and/or designated for the restoration and recovery of JSU, they frustrated the will of Congress, abrogated the President's disaster declaration, and otherwise denied SERVPRO a vested entitlement to federal funds.

110.   Those Defendants sued in their individual capacities knew of the continuing failure to compensate SERVPRO as required by the Disaster Recovery Authorization and Service Contract.

111.   Those Defendants sued in their individual capacities knew that JSU had accepted, reviewed, approved, and submitted SERVPRO invoices to the other

Defendants (including the responsible state and federal agencies and private insurance carriers) for payment.

112.   Those Defendants sued in their individual capacities knew that JSU had in fact received certain funds in response to SERVPRO invoices but either retained or diverted those funds or portions of them to other purposes, including payment of other contractors to which JSU was obligated.

113.   Those Defendants sued in their individual capacities, after having knowledge of this receipt, withholding, diversion or redirection of funds intended for SERVPRO, misrepresented to SERVPRO the status of payments to which it was due.

114.   Those Defendants sued in their individual capacities, after having knowledge of this receipt, withholding, diversion or redirection of funds intended for SERVPRO, repeatedly insisted that SERVPRO continue its work under the Disaster Recovery Authorization and Service Contract, made new work assignments to SERVPRO, and thus caused SERVPRO to incur significant expenses and other costs.

115.   Those Defendants sued in their individual capacities, after having knowledge that funds necessary for payment to SERVPRO were being delayed, withheld or denied outright by other Defendants, state or federal agencies, and private insurers or reinsurers. repeatedly insisted that SERVPRO continue its work

under the Disaster Recovery Authorization and Service Contract, made new work assignments to SERVPRO, and thus caused SERVPRO to incur significant expenses and other costs.

116. In order to induce or compel SERVPRO (under the terms of the Disaster Recovery Authorization and Service Contract) to continue its work, those Defendants sued in their individual capacities, using the authorities conferred by state law, misrepresented through both word and conduct the status and prospects for payments due to SERVPRO, and thus effectuated the continuing deprivation of its property interests secured by the laws and constitutions of the United States and the State of Alabama.

117. This conduct, and the pattern of deception and misrepresentation upon which it was based, was deliberate and intentional and contrary to clearly established controlling law.

## Causes of Action under the Constitution and Laws of the State of Alabama Conversion, Unconstitutional Taking and Inverse Condemnation.

118. Contrary to the guarantees of Alabama Const. Art. I, Sec. 22, in violation of Article I §10 and the Fifth and Fourteenth Amendments to the Constitution of the United States and of the statutes and controlling precedent of Alabama law, including Code of Ala. §41-16-3 (Prompt Payment Law) and the Statute of Frauds, the Defendants or some of them deprived SERVPRO of its

property interest in and ownership of funds to which it had a vested entitlement under the Disaster Recovery Authorization and Service Contract.

119.   These Defendants or some of them acting willfully, maliciously, in bad faith, contrary to the law, beyond their authority or under a mistaken interpretation of the law, wrongfully retained, diverted, and/or converted, or authorized or participated in the wrongful retention, diversion and/or conversion of funds to which SERVPRO was entitled.

120.   The Defendants or some of them secured such funds intended as payment for SERVPRO invoices and originally intended as payment for SERVPRO for its repair and restoration work at JSU.

121.   Rather than transmit these funds to SERVPRO, these Defendants or some of them diverted these funds to other entities or individuals, retained or otherwise refused to transmit such funds to SERVPRO and/or wrongfully converted such funds to other, non-authorized purposes.

122.   This conduct effectively operated as a taking and/or inverse condemnation outside the legal process and beyond the established review, challenge and relief processes.

## Impairment of Contractual Rights

123.   In violation of Alabama Const. Art. IV, Sec. 95 and in violation of Article One Section 10 of the Constitution of the United States the Defendants or

some of them impaired SERVPRO's rights to enforce JSU obligations under the Disaster Recovery Authorization and Service Contract and to seek a remedy for such impairment.

124.   The unconstitutional impairment was accomplished by the application of the Defendants' policies, regulations, and practices under the legislative grants of powers of their offices with the combined effect of rendering the Disaster Recovery Authorization and Service Contract unenforceable.

## Quantum Meruit

125.   At Defendants' direction SERVPRO expended significant time and resources for its work under the Disaster Recovery Authorization and Service Contract.

126.   Defendants knowingly solicited, encouraged, and accepted such performance by SERVPRO as well as the benefits and results therefrom.

127.   Based on the principle of quantum meruit Defendants must compensate SERVPRO for the reasonable value to the Defendants of the services rendered.

## Unjust Enrichment

128.   Those Defendants or the entities for which they are agents or representatives who by withholding, diverting, or retaining funds due to SERVPRO, gained economic benefit and were unjustly enriched to the detriment of SERVPRO.

## Fraud, Fraudulent Misrepresentation and Suppression

129.   Those Defendants sued in their individual capacities knew of the continuing failure to compensate SERVPRO as required by the Disaster Recovery Authorization and Service Contract

130.   Those Defendants sued in their individual capacities knew that JSU had accepted, reviewed, approved, and submitted SERVPRO invoices to the other Defendants (including the responsible state and federal agencies and private insurance carriers) for payment.

131.   Those Defendants sued in their individual capacities knew that JSU had in fact received certain funds in response to SERVPRO invoices but either retained or diverted those funds or portions of them to other purposes, including payment of other contractors to which JSU was obligated.

132.   Those Defendants sued in their individual capacities, after having knowledge of this receipt, diversion or redirection of funds intended for SERVPRO misrepresented to SERVPRO the status of payments to which it was due.

133.   Those Defendants sued in their individual capacities, after having knowledge of this receipt, diversion or redirection of funds intended for SERVPRO repeatedly insisted that SERVPRO continue its work under the Disaster Recovery Authorization and Service Contract, make new work assignments to SERVPRO, and thus incur significant expenses and other costs.

134.   Those Defendants sued in their individual capacities, after having knowledge that funds necessary for payment to SERVPRO were being delayed, withheld, or denied outright by other Defendants, state or federal agencies, and private insurers or reinsurers, repeatedly insisted that SERVPRO continue its work under the Disaster Recovery Authorization and Service Contract, made new work assignments to SERVPRO, and thus caused SERVPRO to incur significant expenses and other costs.

135.   In order to induce or compel SERVPRO (under the terms of the Disaster Recovery Authorization and Service Contract) to continue its work, those Defendants sued in their individual capacities, using the authorities conferred by state law, misrepresented through both word and conduct the status and prospects for payments due to SERVPRO, and thus effectuated the continuing deprivation of its property interests secured by the laws and constitutions of the United States and the State of Alabama.

136.   This conduct, and the pattern of deception and misrepresentation upon which it was based, was deliberate and intentional.

137.   These Defendants or some of them acting willfully, maliciously, in bad faith, contrary to the law, beyond their authority or under a mistaken interpretation of the law, misrepresented to SERVPRO that it would receive payment and

compensation to which it was entitled under its Disaster Recovery Authorization and Service Contract for repair and restoration work at JSU.

138. Such misrepresentations were false and known to be false at the time they were made or even if innocently made were relied upon by SERVPRO to its detriment.

139. The fraudulent conduct was committed by both express verbal misrepresentations that SERVPRO would be compensated for its work and by a course of conduct that was intended to induce SERVPRO to continue its reliance to its detriment on false assurances of payment.

140. The defendant's failure to communicate to SERVPRO that its invoices would not be paid or would be subjected to substantial delays or reductions was the suppression of material facts that Defendants were under a duty to disclose.

141. In reliance on Defendants' misrepresentations and suppressions of material facts SERVPRO continued to fulfill its undertaking to complete the repair and restoration work at JSU even after the Defendants began a practice of delayed payment and non-payment of SERVPRO invoices.

142. The Defendants or some of them with knowledge that JSU was unable or unwilling to comply with its Disaster Recovery Authorization and Service Contract obligations, acted in bad faith to require or allow or induce SERVPRO to

continue to expend funds and resources on the recovery and restoration work, and otherwise breached of the duty of good faith required under Alabama law.

## Civil Conspiracy

143.  In furtherance of the fraud, misrepresentation and suppression described herein, the Defendants or some of them conspired or collectively contrived with and among one another to accomplish the tortious denial to SERVPRO of its rights under the Disaster Recovery Authorization and Service Contract.

144.  These Defendants' conduct was done with the full knowledge and intent that their unlawful actions would result in harm to SERVPRO in being deprived of compensation due and owing under the business relationship and resulted in SERVPRO further being deprived of payment in full for work completed in accordance with the terms of the Disaster Recovery Authorization and Service Contract.

145.  The Defendants' actions were designed with the intent to procure benefit to themselves while causing detriment to SERVPRO.

## Tortious Interference with Business Relations and Defamation

146.  These Defendants or some of them engaged in the tortious interference with business relationships by impeding or otherwise hindering the parties to the Disaster Recovery Authorization and Service Contract from fulfilling obligations or securing enforcement of them.

147.    These Defendants or some of them tortiously interfered with a Disaster Recovery Authorization and Service Contract by hindering the parties in their fulfillment of obligations or enforcing Disaster Recovery Authorization and Service Contract rights.

148.    The Defendants' tortious conduct resulted in damage to SERVPRO's business relationships with its other clients, the contractors, and subcontractors upon which it relies for the work at JSU and sites of other contracts, its creditors, and its prospect for future work at on behalf of JSU or other public entities

149.    The Defendants' false, inaccurate, and otherwise defamatory statements concerning SERVPRO's performance and financial practices under the Disaster Recovery Authorization and Service Contract constituted tortious interference with business relations and defamation.

## Loss of Business Opportunity

150.    As a result of the Defendants' tortious conduct SERVPRO's ability to conduct or participate in other business activities or to maintain existing business relationships or undertake new ones was impaired.

151.    The Defendants' false, inaccurate and/or defamatory statements concerning SERVPRO's performance under the Disaster Recovery Authorization and Service Contract resulted in a loss of business opportunities.

**RELIEF REQUESTED: EQUITABLE RELIEF**
**PROSPECTIVE INJUNCTIVE RELIEF UNDER THE CONSTITUTION**
**AND LAWS OF THE UNITED STATES AND A WRIT OF MANDAMUS**
**TO SECURE COMPLIANCE WITH ALABAMA LAW**

152. SERVPRO requests a mandatory injunction under the authority of *Ex parte Young,* 209 U.S. 123, 28 S. Ct. 441 (1908) and a writ of mandamus under the authority of *Ala. DOT v. Harbert Int'l, Inc.*, 990 So. 2d 831 (Ala. 2008) requiring James Brigham in his official capacity as Chief Financial Officer of Jacksonville State University; Don C. Killingsworth in his official capacity at President of Jacksonville State University; David Thompson in his official capacity as Director of Capital Planning and Facilities of JSU, A-K (those with responsibility for review, approval, payment of Plaintiff/Petitioner's invoices for Disaster Recovery Authorization and Service Contracts performed in the restoration of facilities at Jacksonville State University) also in their official capacities:

a. To issue the necessary warrants, checks, transfers, authorizations or other requisite financial actions to fulfill the Disaster Recovery Authorization and Service Contractual obligations to SERVPRO as a result of performance of its Disaster Recovery Authorization and Service Contractual obligations related to the repair and restoration work at JSU.

b. To submit all SERVPRO invoices related to the repair and restoration work at JSU to the necessary and appropriate sources of payment,

reimbursement and/or indemnity and to transmit any funds received as a result to SERVPRO.

c. To enforce JSU's rights to secure the compliance of insurance, excess insurance and reinsurance carriers and other entities including agencies of the state of Alabama responsible for some or all of the remaining financial obligation to SERVPRO with their obligations under the Disaster Recovery Authorization and Service Contracts of insurance or other sources of funds designated for this undertaking.

d. To require that all related claims under such policies be appropriately submitted for payment and that all Disaster Recovery Authorization and Service Contract obligations for coverage and indemnity be enforced.

e. To require that any funds transferred to or made available to the institutional account or credit of JSU in response to SERVPRO's invoices or otherwise intended as compensation for SERVPRO's repair and restoration work at JSU be tendered to SERVPRO.

f. To require that any such funds, having been received by JSU or on its account or for its benefit in payment for SERVPRO invoices, that were tendered to another party, i.e., another JSU contractor or creditor, be immediately recouped and tendered to SERVPRO.

g.     To require the computation, payment, and transfer of all accumulated interest as provided by the Disaster Recovery Authorization and Service Contract and by Alabama law.

h.     To require a complete accounting of all financial transactions to which JSU was a party or by which JSU was affected relating to all funds received.

## RELIEF REQUESTED: LEGAL RELIEF

### Sought against those Defendants that or who are non-public entities or privately employed individuals and those Defendants sued in their individual capacities.

153.   Legal damages in an amount sufficient to compensate SERVPRO for its compensable losses and allowable damages caused by those Defendants sued here in their individual capacities, and Defendants S-Z.

154.   Punitive damages in an amount sufficient to punish those Defendants sued here on their individual capacities, and Defendants S-Z and to deter others from similar misconduct.

## ADDITIONAL RELIEF

155.   An award of attorneys' fees, costs, interest, and such other relief as the Court may deem appropriate.

Date:  April 1, 2021

Respectfully Submitted:

*s/Barry W. Hair*
Barry W. Hair (ASB-8620-h40b)

*s/Brad J. Smith*
Bradley J. Smith (ASB-6847-b52s)

Clark, Hair & Smith, P.C.
1000 Urban Center Drive, Suite 125
Birmingham, AL  35242
205-397-2900
205-397-2901 – Fax
E: bhair@chslaw.com
E: bsmith@chslaw.com

**OF COUNSEL**

Stanley J. Murphy (ASB-6904-h59s)
Murphy & Murphy, LLC
P.O. Box 3163
Tuscaloosa, AL 35403
(205)349-1444
E: murphyandmurphy@bellsouth.net

## SERVICE BY PRIVATE PROCESS SERVER:

James Brigham
Senior Vice President for Finance & Administration
Jacksonville State University
700 Pelham Road North
Jacksonville, Alabama 36265

David Thompson, MBA, BS Civil Engineering Director
Capital Planning & Facilities
Duncan Maintenance Building
Jacksonville State University
700 Pelham Road North
Jacksonville, Alabama 36265

Don C. Killingsworth, President
Jacksonville State University
700 Pelham Road North
Jacksonville, Alabama 36265